IN THE MATTER OF: THE PURPORTED WILL OF KARL ARTHUR
ANDREWS

No. 7820SC780

(Filed 3 July 1979)

**Wills § 21.4— caveat proceeding—undue influence—insufficiency of evidence**

Evidence in a caveat proceeding was insufficient to submit to the jury on the question of undue influence where provisions of testator's will and codicil which differed from past wills did not indicate that the later instruments were procured by undue influence; the differences apparently resulted from an intent to avoid a heavy estate tax; there was no evidence which showed that testator's wife was responsible for the procurement of the will; the beneficiaries under the will were the natural objects of testator's bounty and were the same beneficiaries who took under the prior wills; no evidence tended to show that testator was in such a physical and mental condition that he was susceptible to domination and influence by his wife; and the evidence tended to show that testator personally continued his business dealings until his death, over a year after the codicil was executed.

Judge CARLTON dissenting.

APPEAL by propounders from *Hairston, Judge.* Judgment entered 18 April 1978 in Superior Court, MOORE County. Heard in the Court of Appeals 3 May 1979.

Propounders appeal from a judgment entered in accordance with a jury verdict finding that the execution of the last will and testament of Karl Arthur Andrews (testator) was procured by undue influence. Propounders are the wife of testator, Mrs. Andrews, and the guardian ad litem for testator's grandchildren.

Testator died on 27 November 1976 at the age of seventy-seven. He had been in declining health for several years. A will executed in 1974 and a codicil executed in 1975 were presented to the Clerk of Superior Court of Moore County for probate. Testator's son, Karl Andrews, Jr., filed a caveat to the will and codicil, alleging that they were not the last will and testament of

the testator because they were procured by the undue influence of testator's wife.

The evidence shows that testator executed a series of wills and codicils prior to the execution of the will and codicil in question. Since the pattern of dispositions is relevant to the question of undue influence, a review of these instruments is necessary.

Testator executed a will in 1962 which devised one-half of his estate to Mrs. Andrews absolutely. The remainder he devised in trust, naming his son, Karl Andrews, Jr., as beneficiary. When his son reached the age of twenty-eight, the trust was to terminate and his son was to receive the principal. If his son died prior to the termination of the trust, the principal was to be given to his son's issue, if any, and if none to Mrs. Andrews. If she were not living then the principal was to go to testator's stepson, Michael Jad Mahaley, the son of Mrs. Andrews. Mrs. Andrews was named executrix.

In 1965, testator executed a codicil to the 1962 will which appointed Mrs. Andrews and R. F. Hoke Pollock as co-executors of the will.

In 1966, testator executed a second codicil to the 1962 will which removed Mrs. Andrews as co-executor and appointed R. F. Hoke Pollock as sole executor. The codicil further stated that if the testator's death should result from any cause other than natural causes, his wife, Mrs. Andrews, should receive nothing under the will. He also directed that an autopsy be performed to determine the cause of death.

In 1970, testator executed a will revoking all prior wills and codicils. In that will, he devised his estate to a trustee to pay one-half of the income to Mrs. Andrews for life and one-half to Karl Andrews, Jr., for life. Upon the deaths of the income beneficiaries, the principal was to be distributed to testator's grandchildren in equal shares. He appointed R. F. Hoke Pollock as executor.

In 1974, testator executed the will in question. In this will, he bequeathed all of his tangible personal property to his wife. If his wife predeceased him, the property was to go to his son, Karl Andrews, Jr., if he survived the testator, and if not, then to his son's surviving issue and his stepson, Michael Jad Mahaley, in equal

shares. All the furniture, household goods, silverware, china and ornaments were acknowledged to be the property of his wife. Testator devised one-half of his "adjusted gross estate" to his wife in such a manner as to take advantage of the maximum marital deduction. The rest of his estate testator devised in trust for the benefit of his son. The son was to receive the income for life and at his death, the principal was to be divided equally between testator's stepson, Michael Jad Mahaley, and his grandchildren. A spendthrift provision was attached to this trust whereby the income was to be paid to Mrs. Andrews and the principal beneficiaries in the event an income beneficiary tried to sell or transfer his interest in the trust. The testator appointed his wife as executrix.

A codicil to this will was executed in July, 1975, which altered the provisions of the trust to provide that upon the death of Karl Andrews, Jr., Mrs. Andrews, if she were still living, was to receive the income from the trust for her lifetime.

The first two wills and codicils were drafted by R. J. Hoke Pollock and executed by the testator in Southern Pines. Mr. Pollock had been testator's attorney for some time prior to the drafting of the 1962 will. Mrs. Andrews was never present at the execution of these instruments. The 1974 will and 1975 codicil were drafted by Paul Wyche, a Charlotte attorney. At the time these instruments were executed, Wyche was employed by Belk Stores Services, Inc., as an attorney. Wyche first learned of Mr. Andrews when he was asked by a superior to draw up a will. Wyche contacted the testator by phone and drafted the will. He sent a copy to the testator and a couple of weeks later, testator went to Charlotte and signed the will. Mrs. Andrews was with him. In response to subsequent conversations, Mr. Wyche revised the will in November, 1974. No action was taken, however, until 1 July 1975 when Wyche went to Pinehurst at testator's request, to discuss the will. Wyche spent most of the day talking with the Andrews and their accountant. As a result of this discussion, the 1975 codicil was executed in Pinehurst.

Wyche subsequently prepared deeds for the testator transferring certain land from the testator to him and his wife as tenants by the entireties. This action was taken in response to conversations about estate planning and avoiding probate. Wyche

also handled other real estate transactions for testator including the sale of some land to the Sheraton Motel. Wyche testified that almost all of his dealings and conversations were with testator although Mrs. Andrews was usually present. Wyche stated that the impetus for the new will, codicil, and transfer of some of the real estate was that testator had read a book entitled "How to Avoid Probate."

Caveator presented evidence at trial concerning the testator's declining health and relationship with his wife. Charles Martin, a barber, knew testator as a customer. He testified that between 1962 and 1973, testator had been particular about his appearance but after 1973, testator showed less concern. Testator was not as alert or as conversational as he had once been. Polly McFadyen, a nurse, also testified that when she saw testator in 1974 and 1975, he was not his normal self; he was not as alert as he used to be.

Polly Carson, a former employee of testator, stated that in 1975 she went to visit testator at his home. Testator was relaxed and outgoing at first but when Mrs. Andrews appeared, testator became very nervous, had tears in his eyes and could not speak. Carson testified that Mrs. Andrews, in an angry voice, asked of someone in the room, "Did you ever know a son-of-a-bitch who had a bastard for a son." A motion to strike was granted because the statement was not responsive to the question but a motion for a mistrial was denied.

Marty McKenzie, a realtor, negotiated the sale of some property with testator and Mrs. Andrews in late 1975 or early 1976. Most of his discussions were with Mrs. Andrews although testator was present. At one point, testator referred to a certain tract of land but was told by his wife that he had sold that property. Testator was apparently confused as to whether he owned it.

Donald Robert Calfee, the manager of the Sheraton Motor Inn in Southern Pines, testified that he negotiated the purchase of a piece of property with testator in 1975. He met with testator on one occasion and thereafter called testator six or seven times but never talked with him. On each occasion, he spoke with Mrs. Andrews who said testator was either resting or had had a bad night and could not be bothered. She told him to contact her at-

torneys in Charlotte who would handle the closing. Calfee later saw testator in 1976 at the Sheraton and testator asked him why he had never called.

John Scott testified that in April, 1974, he called testator to ask a favor and testator told him to come by the house the next day. When Scott arrived Mrs. Andrews would not let him see testator. Scott later attempted to get in touch with testator but was told he was resting or could not come to the phone.

Edward Earl Hubbard testified that on several occasions in 1975, he called testator and left a message to have him return the call. The calls were never returned. Hubbard saw testator in 1975 or 1976 and was not sure whether testator recognized him.

In rebuttal, propounders presented testimony in addition to that of Paul Wyche. Joseph Hiatt, Jr., testator's physician, testified that testator had high blood pressure and diabetes. He suffered a major heart attack in 1969. In 1972, he developed double vision, dizziness and difficulty in walking. Testator incurred a loss of hearing in his left ear. Dr. Hiatt saw testator about a week before his death and stated that testator was in better health than he had been in months. Dr. Hiatt stated that although testator was normally a happy person, he had become depressed in his later years because he couldn't work like he wanted to. On cross-examination, Dr. Hiatt testified that Mrs. Andrews gave testator his insulin shots. Dr. Hiatt was not familiar with the relationship between testator and Mrs. Andrews.

Propounders presented the testimony of several other persons tending to show that they had conducted business transactions with testator during the period between 1972 and 1976. The testator had handled the affairs himself and Mrs. Andrews was generally not involved. Testator was described as being a considerate man but prone to doing exactly what he intended to do. Testator's accountant testified that testator had discussed his estate with him within the last few years of testator's life. Based on his observations, the accountant felt that testator made his own business decisions.

Propounders' motions for a directed verdict made at the close of caveator's evidence and at the close of all of the evidence were denied. The case was submitted to the jury which found

that the executions of the 1974 will and 1975 codicil were procured by undue influence and that they were not the last will and testament of Karl Arthur Andrews. From a judgment entered in accordance with this verdict, propounders appeal.

*Bryant, Hicks & Sentelle, by David B. Sentelle and Richard A. Elkins, for propounder appellants.*

*Van Camp, Gill & Crumpler, by James R. Van Camp and Douglas R. Gill, for caveator appellee.*

VAUGHN, Judge.

The issue to be determined on this appeal is whether caveator presented sufficient evidence of undue influence exerted by Mrs. Andrews to withstand propounders' motions for a directed verdict.

> "[U]ndue influence which justifies setting aside the testator's will is an influence which controls or coerces the mind of the testator so as to induce him to make a will which he would not have made otherwise. Influence is also spoken of as being undue when it destroys the testator's free agency." 1 N. Wiggins, Wills and Administration of Estates in North Carolina § 55 at 133 (1964).

The burden of proof lies upon the propounder to prove that the instruments in question were executed with the proper formalities required by law. *In re Will of West*, 227 N.C. 204, 41 S.E. 2d 838 (1947). Once this has been established, the burden shifts to the caveator to show by the greater weight of the evidence that the execution of the will was procured by undue influence. *In re Will of Simmons*, 268 N.C. 278, 150 S.E. 2d 439 (1966); *In re Will of West, supra.*

> Proof of undue influence is, necessarily, circumstantial.

> " 'Experience has shown that direct proof of undue or fraudulent influence is rarely attainable, but inferences from circumstances must determine it.' It is 'generally proved by a number of facts, each one of which standing alone may have little weight, but taken collectively may satisfy a rational mind of its existence.' " (Citation omitted.) *In re Mueller's Will*, 170 N.C. 28, 29, 86 S.E. 719 (1915).

Factors to be considered on the issue of undue influence include:

"1. Old age and physical and mental weakness.

2. That the person signing the paper is in the home of the beneficiary and subject to his constant association and supervision.

3. That others have little or no opportunity to see him.

4. That the will is different from and revokes a prior will.

5. That it is made in favor of one with whom there are no ties of blood.

6. That it disinherits the natural objects of his bounty.

7. That the beneficiary has procured its execution." *In re Mueller's Will, supra,* at 30.

If there is sufficient evidence of undue influence, the issue should be presented to the jury. *In re Will of Beale,* 202 N.C. 618, 163 S.E. 684 (1932). The question is, therefore, did caveator present sufficient evidence to go to the jury.

We first note the pattern of distributions in the prior wills and codicils. The 1974 will and 1975 codicil do not materially differ from the 1962 will. The main distinction is that under the later devise, testator's stepson takes a vested interest in part of the estate whereas in the former his interest was contingent. Mrs. Andrews receives a greater interest because she receives the personal property and the life estate in the trust for Karl Andrews, Jr., after his death. The codicils to the 1962 will do, however, remove Mrs. Andrews as executrix. Although the 1966 codicil to the 1962 will implies that testator and his wife were at odds, the provisions in that codicil do not appear in the 1970 will.

The 1974 will and its codicil differ from the 1970 will in that Mrs. Andrews takes her interest outright rather than a life estate. She also receives the personal property and is appointed executrix. Nevertheless, we must note that Mr. Pollock, testator's local attorney, testified that the 1974 will takes advantage of the marital deduction provisions whereas the 1970 will does not. Use of this provision can result in substantial tax savings. Mr. Pollock also testified that he never knew the extent of testator's holdings. There was evidence which showed, however, that the estate was

worth over one million dollars. There was further testimony which showed that testator had read a book on avoiding probate and that this was the impetus to write the 1974 will.

We also cannot ignore the testimony of Mr. Wyche who drafted the 1974 will. He indicated that all of his important conversations were with testator alone. He discussed at length the drafting of the 1975 codicil when he went to Pinehurst in July, 1975. He stated that although Mrs. Andrews was present, she did not take part in any material discussions. The import of his testimony was that testator acted freely and knowingly in executing this will and codicil.

Based on the testimony concerning the execution of the 1974 will and the 1975 codicil, we cannot say that the provisions differing from past wills indicate that these instruments were procured by undue influence. The differences apparently resulted from an intent to avoid a heavy estate tax. There was no evidence which showed that the procurement of this will was made by Mrs. Andrews. The beneficiaries under the will were the natural objects of testator's bounty and were the same beneficiaries who took under the prior wills.

Furthermore, no evidence was presented which showed that testator was in such a physical and mental condition that he was susceptible to domination and influence by his wife. Testator had some physical problems and was prone to depression. Two people testified that testator suffered from a lapse of memory on two occasions. Some people had problems contacting testator. One witness testified that, on one occasion, testator became fearful and nervous in his wife's presence. Nevertheless, the evidence shows that he personally continued his business dealings up until his death, over a year after the codicil was executed.

We conclude that the evidence presented at trial was insufficient to submit to the jury on the question of undue influence. There is no evidence that such influence was exerted on testator as to control his mind and force him to execute a will which he otherwise would not have executed. We, therefore, reverse.

---
**In re Andrews**
---

Reversed.

Judge CLARK concurs.

Judge CARLTON dissents.

Judge CARLTON dissenting.

I concur with the majority's statement of the applicable law in an action of this nature. I strongly disagree, however, with the majority's evaluation of the evidence disclosed by the record. Indeed, it seems to me that caveator's evidence was abundant to withstand propounders' motions for a directed verdict. I must, therefore, respectfully dissent.

I note below those factors which compel me to conclude that propounders' motions were properly disallowed so that the case could be submitted for decision to the twelve:

(1) The majority attaches no significance to the change in the pattern of distribution in the various wills and codicils. With this conclusion, I strongly disagree. A review of the salient portions of the various instruments illustrates a vastly superior position for Mrs. Andrews and her son in the propounded will as compared to the earlier instruments:

a. In the 1962 will, Mrs. Andrews was devised a one-half interest in the estate. The other one-half was devised in trust to Karl Andrews, Jr. His half could only go to Mrs. Andrews' son in the event that Karl Andrews, Jr., died prior to the termination of the trust *and* provided he had no surviving issue *and* provided Mrs. Andrews had predeceased him. Mrs. Andrews was named as executrix in this will.

b. The 1965 codicil simply named attorney Pollock as a co-executor with Mrs. Andrews. The reasonable inference to be drawn from this act by the testator was that he did not wish for his wife alone to be vested with the powers of an executor.

c. The 1966 codicil removed Mrs. Andrews as co-executrix and appointed attorney Pollock as sole executor. This codicil also gives rise to the inference that Mr. and Mrs. Andrews had problems of some nature. It provided that if the testator's death

should result from any causes other than natural causes, his wife would take nothing under the will. Further, he directed that an autopsy be performed to determine the cause of death.

d. The 1970 will revoked all prior wills and codicils. There, Mrs. Andrews would receive only an *income interest* to one-half of the estate *for the term of her life*. The other one-half in income was devised to Karl Andrews, Jr., for life. Under this will, upon the deaths of the income beneficiaries, the principal would have been distributed to testator's grandchildren in equal shares. I note here that Mrs. Andrews' son would have taken *nothing* under this will. Moreover, attorney Pollock is named as the executor.

The will in question was written in 1974. Both the position of Mrs. Andrews and her son are drastically improved under the contested will. Here, Mrs. Andrews was bequeathed *all* tangible personal property. All furniture, household goods, silverware, etc. were acknowledged to be the sole property of Mrs. Andrews. Mrs. Andrews would then receive one-half of the "adjusted gross estate" outright. The other half would go to Karl Andrews, Jr., in trust and at his death the principal would be divided equally between Mrs. Andrews' son and the grandchildren of the testator.

In other words, neither Mrs. Andrews nor her son would have received any fee simple interest in Mr. Andrews' estate under the 1970 will which was prepared by the testator's regularly retained attorney. From that mere income beneficiary status in 1970, Mrs. Andrews, under the 1974 will, would have received a one-half fee simple interest in his estate in addition to all of his tangible personal property and household goods. With respect to Mrs. Andrews' son, he would have received nothing under the 1970 will, yet attained equal status with the testator's grandchildren under the 1974 will.

I also disagree with the majority's conclusion that there is little difference in the interest Mrs. Andrews would receive between the 1962 will and the 1974 will. The record discloses that the testator's 1974 will included the following provision:

The aforesaid percentage of my residuary estate [the portion devised to Mrs. Andrews] constituting my wife's share shall be ascertained from the determinations finally arrived at for

purposes of the federal estate tax, subject to such adjustment as may be necessary to carry out the provisions of this Will to the effect that *my wife's share shall not be reduced by any estate, inheritance, transfer, succession, legacy or similar taxes. . . .* (Emphasis added.)

In other words, under the 1974 will, Mrs. Andrews would receive a one-half *net* interest in fee simple undiminished by the payment of state and federal inheritance and estate taxes. Under the 1962 will, Mrs. Andrews would have received one-half of Mr. Andrews' estate after the payment of estate and inheritance taxes. The record also discloses that Mr. Andrews' estate was worth at one point between $1 million and $1.5 million. Obviously, the difference in the value of the estate ultimately received by Mrs. Andrews would be greatly increased if that value is computed by subtracting all inheritance and estate taxes from that portion of the estate devised in trust to Karl Andrews, Jr.

Moreover, Mrs. Andrews was named as the executrix in the 1974 will. While this may appear incidental at a glance, it is of particular significance in a will of this nature which utilizes the special provisions of our federal estate tax laws allowing a wife to receive one-half of a husband's estate free from federal estate taxes. The significance is this: The will vests the power in the executrix to determine which property shall go into which half of the estate. In other words, Mrs. Andrews could choose that portion of the property to be allocated to her.

I agree that the evidence gives rise to the inference that the 1974 will reflects an interest by the testator in taking advantage of inheritance and estate tax savings provided by the Internal Revenue Code. However, I do not agree that we should ignore Mrs. Andrews' improved position in the 1974 will along with the other factors noted below.

I also note that Mrs. Andrews' position was again improved by the 1975 codicil which provided for her to be the income beneficiary of the Karl Andrews, Jr., trust should he predecease her.

(2) I think also that the usage of counsel by testator throughout the years gives rise to a reasonable inference of undue influence by Mrs. Andrews. Except for the final will and

In re Andrews

codicil, all prior instruments had been prepared by attorney Pollock in Southern Pines. Counsel preparing the propounded will and codicil, the record discloses, was an employee of Belk Stores Services, Inc., in Charlotte. There is also some indication in the record that Mrs. Andrews was previously employed either by that company or one of its employees. I also am impressed that the 1974 will was prepared by counsel in Charlotte as a result of a telephone call and that counsel had never seen Mr. Andrews until he appeared (with Mrs. Andrews) in his office in Charlotte to execute the will. In a word, there is a reasonable inference here that Mrs. Andrews influenced the testator to have a new will prepared by an attorney of her choosing, with whom the testator was not familiar, far from his home, and drafted to her and her son's obvious advantage.

(3) The majority opinion notes, and I will not repeat it here, various portions of the evidence giving rise to the reasonable inference that Mr. Andrews was not in normal health during the period when these transactions took place.

(4) The majority enumerates seven "factors to be considered on the issue of undue influence." (Quoting from *In re Mueller's Will*, 170 N.C. 28, 86 S.E. 719 (1915).) Upon reviewing those factors, I conclude that there is evidence in caveator's favor with respect to *every single one of them*. The evidence is clear with respect to his advanced age. There is some evidence of physical and mental weakness. There is evidence that he was in the home of the beneficiary and subject to her constant association and supervision. There is some evidence that others had little or no opportunity to see him. There is abundant evidence that the will is different from and revokes prior wills. It is clear that it is made in favor of one with whom he has no ties of blood. It is clear that, to some extent at least, it disinherited the natural objects of his bounty. There is a reasonable inference from the evidence that Mrs. Andrews had procured the will's execution.

In summary, I agree that there is not overwhleming evidence of undue influence on the part of Mrs. Andrews. I do believe, however, that there is more than a scintilla of evidence; indeed, the evidence is abundant that improper influence may have been exerted over Mr. Andrews by Mrs. Andrews such that the matter should be submitted to the jury for decision. Surely, on the basis

of the evidence disclosed by the cold record before us, the trial judge, who was present and observed the witnesses as they testified upon the stand, was in a superior position to determine whether the matter should be resolved as a matter of law or be submitted to the ultimate trier of facts. I believe that Judge Hairston decided properly and that the law should not disturb the verdict reached by the twelve.